# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| KURT JOHANSEN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 15 C 2376 |
| | ) | |
| MARK CURRAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

On December 3, 2015, Plaintiff Kurt Johansen ("Johansen") filed his five-count Amended Complaint against thirty-six defendants, including Lake County, Illinois, and two members of the Lake County Sheriff's Department (collectively, the "Lake County Defendants"); and Wexford Health Sources, Inc. ("Wexford") and numerous of its employees (collectively, "Wexford Defendants"). On May 10, 2016, we dismissed the Lake County Defendants and several Wexford Defendants from the case. Counts III and V of Johansen's Amended Complaint were also dismissed. Still pending are three counts, all brought via 42 U.S.C. § 1983: Count I, a "Denial of Medical Care" claim; Count II, a "Failure to Intervene" claim; and Count IV, a *Monell* claim against Wexford.

The claims pending before the Court are only against Defendants Wexford, Dr. Eric Mizuno ("Dr. Mizuno"), Katie Johnson ("Johnson"), Marie Townsend

("Townsend"), Trina Weatherspoon ("Weatherspoon") and Leticia Perez ("Perez").[1] Now before the Court are both Johansen's and the remaining Wexford Defendants' cross-motions for summary judgment. For the following reasons, the Court grants in part and denies in part both motions.

## BACKGROUND

The following facts taken from the record are undisputed, except where otherwise noted.

### I. Parties & Places

Johansen is a former pretrial detainee who was primarily detained in McHenry County Jail ("McHenry"). He was transferred and detained at Lake County Jail ("Lake County") from March 19, 2014 to April 7, 2014, and again from April 29, 2014 to May 1, 2014.

Defendant Wexford was a contract provider of medical and mental health services to detainees at Lake County. Wexford was responsible for providing experienced and qualified health care professionals to administer medical and mental health services to detainees. Wexford was also in charge of hiring, training, and supervising all health care providers at Lake County.

---

[1] Both parties apparently agree that these are the only remaining claims and defendants in this case. As a result, all other defendants are dismissed with prejudice.

Defendants Dr. Mizuno, Johnson, Townsend, Weatherspoon, and Perez were all employed by Wexford to provide medical care at Lake County during the time period relevant to this suit.

## II.   Johansen's Medical Care at Lake County

Johansen was transferred to Lake County from McHenry on March 19, 2014. The transfer was unexpected and occurred without any medical transfer paperwork from McHenry.  While at McHenry, save for the first few days, Johansen regularly received medication for depression and anxiety.

Upon Johansen's arrival at Lake County, Wexford nurse Karen Counley ("Counley") performed screening and intake mental health assessments on him. Johansen told Counley that he suffered from sleep apnea, depression, anxiety and hypertension.  He also told Counley that he had previously been prescribed with: (1) hypertension medications; (2) Citalopram, an antidepressant drug prescribed for depression, anxiety and panic disorders; and (3) a Xanax derivative.  Johansen informed Counley that McHenry did not issue Xanax, but medical staff substituted it with hydroxyzine.

The intake nurse is responsible for beginning the verification process to confirm the medications that an inmate self-reports that he or she is taking.  Other nurses take part in the process, following up on verification efforts when necessary.  Once the medications are verified, a physician can enter an order to dispense those medications. The intake nurse calls the doctor for any medical prescriptions and the psychiatrist for

psychotropic medications. After the intake assessment, inmates at Lake County are to receive a physical assessment within fourteen days.

The parties are in dispute as to whether Counley made a records request to McHenry to confirm Johansen's medications. Defendants cite to testimony by Defendant Townsend, who was apparently shown a document from McHenry that she identified as an authorization form completed by Counley and signed by Johansen as a release to obtain his records from McHenry. Johansen, however, emphasizes that his medical file includes no such records authorization form. Nor do Defendants cite to the purported authorization form as an exhibit.

Wexford employees Tracie Steele ("Steele") and Townsend reviewed Johansen's receiving screening and intake mental health assessments forms completed by Counley. The forms indicated that Johansen suffered from depression and anxiety and was taking medically prescribed psychotropic medications. The forms reflected a normal mental status and recommended a routine mental health referral for Johansen. On March 20, 2014, Townsend documented a telephone order from Dr. Mizuno, which was cosigned by Defendant Weatherspoon. Dr. Mizuno did not place Johansen on any blood pressure medications at the time, but placed him on blood pressure monitoring twice a week. Despite reviewing Johansen's medical forms, Dr. Mizuno and Townsend never directly interacted with Johansen at Lake County.

At Lake County, Wexford employees passed through the housing units on a daily basis for the "medication pass," also called the "med pass." During his first couple of

days at Lake County, Johansen inquired about his depression medications during the med passes, but was not given any. Defendants note that speaking to individuals during the daily med pass was not the appropriate channel for addressing questions or concerns regarding medical care. Instead, inmates were to complete a written request form. Johansen notes, however, that Dr. Mizuno admitted that one of the ways that medical requests were brought to the attention of nurses was via informal requests made by inmates during med pass.

On March 21, 2014, Johansen submitted a health care request form, stating:

I need my depression medication ASAP – if/when I stop taking it cold turkey, I begin to get [severely] depressed and suicidal. It has been 3 days since my last dose. Please call McHenry County Jail to verify my dosage of medication.

Johansen's request was forwarded to mental health services on March 23, 2014. The next day, Defendant Johnson, a Wexford social worker, conducted a mental health evaluation of Johansen. On the mental health evaluation form, Johnson marked that Johansen had a history of suicidal behaviors, but added that they were "ideations only." She wrote that Johansen was taking citalopram (for depression) and hydroxyzine (for anxiety), that his last use was the previous Wednesday (while at McHenry), and that his voiced complaint was that he needed his medications. Nonetheless, Johnson determined that Johansen's mood was "fine" and his affect "appropriate." Johnson indicated that Johansen should be referred to psychiatry by checking a box at the bottom of the mental health evaluation form stating so. She did not, however, directly contact

a psychiatrist regarding Johansen or his medication needs.  She testified that when an inmate complained he was not receiving a medication, she would typically refer the matter to nursing staff.

On March 25, 2014, Johansen filed a grievance requesting his prescribed medications.  According to his grievance, Johansen had made thirteen verbal requests and one written request to have Wexford staff verify his medications with McHenry.  Johansen wrote in his grievance that stopping his antidepressant (citalopram) cold turkey causes him to suffer "extreme mood swings," "heightened anxiety," and "thoughts of suicide."  He stated that he was "beginning to experience these feelings" at the time of the grievance and that he expressed these feelings to Johnson.

The grievance was reviewed the same day by Lake County employee Timothy Kicklighter ("Kicklighter"), who placed Johansen on suicide watch as a result.  Johansen claims that Kicklighter spoke with Wexford employees Weatherspoon and Joyce Jordan-Pough ("Jordan-Pough") regarding Johansen's concerns and his medications.

Weatherspoon, however, denied ever having any such conversation with Kicklighter.  She also denied ever being notified that an inmate was placed on suicide watch.  While at Lake County, Weatherspoon did not contact a pharmacy or medical care provider to verify an inmate's medication, did not takes orders to make a call to the doctor, did not contact another correctional facility to request medical records, and did not request that an inmate sign an authorization form for medical records.  She did

not recall ever contacting a social worker or psychiatrist, and did not recall having any conversations with nursing staff and/or social workers regarding Johansen.

On March 26, 2014, one week after arriving at Lake County, Johansen received a physical and mental health screening. The mental health screening form indicated that Johansen's mood was angry and depressed. It also noted that he had a history of psychotropic medication, a history of outpatient mental health treatment, and a chronic mental health problem. Dr. Mizuno reviewed and signed Johansen's Medical History and Physical Assessment and the Mental Health Screening and Evaluation. Dr. Mizuno noticed that Johansen's blood pressure was borderline at 140 over 90 and ordered blood pressure medication for him.

Johnson met with Johansen while he was on suicide watch on March 26. Johnson and Johansen discussed the contents of Johansen's grievance, and Johansen reported his concerns about not receiving his medications. Side effects of withdrawal from Citalopram may include dizziness, nausea, vomiting, diarrhea, tremors, lack of sleep, and appetite change. Johnson testified that she was "sure there are" withdrawal symptoms from abruptly stopping antidepressant medications, but she was not aware of any specific symptoms. After determining that Johansen was not suicidal at the time and did not present acute distress, Johnson took Johansen off suicide watch. She also planned to follow up with Johansen within seven days and to speak with a nurse regarding his medications. There is no evidence on the record that she did, indeed, speak with a nurse.

Johansen met with Johnson again on March 31, 2014, at which point Johansen told her that he had still not received his medications. Johnson testified that Johansen told her that his lack of medications did not concern him, though, because he was going back to McHenry soon.

It was policy at Lake County that if the mental health screening revealed a history of mental health treatment, medical staff were required to obtain the inmate's mental health treatment records. While Johnson noted Johansen's self-reported medications, she did not verify his medical history, did not obtain his medical and/or mental health records from McHenry, and did not obtain his records from his outpatient mental health care provider. Johnson did not speak directly to the psychiatrist about getting Johansen his medications.

During his first stint at Lake County, Johansen received his blood pressure medications from Weatherspoon on March 27, March 31, and April 3, 2014. He did not receive any psychotropic medications.

On April 7, 2014, Johansen left Lake County and returned to McHenry. Johansen received his depression medications within ten hours of returning to McHenry. The symptoms of depression that he experienced at Lake County subsided and, within three or four days, Johansen "started to feel sort of like [him]self again."

On April 29, 2014, Johansen returned to Lake County. Defendant Leticia Perez performed an intake assessment on Johansen. Perez obtained a signed release from Johansen, faxed the release to Walgreen's, and recommended a routine mental health

referral based upon Johansen's answers to her questions. Johansen left Lake County on May 1, 2014.

Johansen filed only one grievance during his time at Lake County and did not appeal the response to his grievance. Johansen notes, however, that he had already been released from the custody of Lake County by the time he could have appealed the grievance response. The grievance was not forwarded to medical staff nor responded to by Officer Quick until April 5, 2014. Johansen's grievance does not, however, appear on the grievance log generated by Wexford employees at Lake County. Johansen did not receive a response to his grievance until April 6, 2014, one day after it was signed by Officer Quick. The response stated that the grievance would be forwarded to medical staff.

While at Lake County, Johansen kept a journal, in which he wrote about his feelings of depression and anxiety, and how he perceived the lack of medication affected him. Johansen did not suffer any physical injuries as a result of the medical and mental health care he received—or did not receive—at Lake County. He did, however, suffer emotional and mental injuries as a result of the lack of mental health treatment at Lake County. Without his medications, Johansen began experiencing feelings of anxiety, impending doom, loneliness, loss of appetite, and lethargy. He also suffered mild panic attacks and had trouble sleeping. These feelings reached their "peak" at Lake County right before Johansen submitted his grievance. Long-term, Johansen suffers from feelings associated with the effects of post-traumatic stress

disorder, including increased anxiety at the thought of Lake County, an exaggerated fight or flight response toward Lake County, and terror of a repeat experience at Lake County. A mental health professional has helped him identify "feelings similar to PTSD" as a long-term injury suffered as a result of the lack of depression treatment at Lake County.

In all, Johansen was seen on five occasions by social workers and nurses during a twenty-day period. Ultimately, Johansen did not receive any medication for his anxiety or depression during his stay at Lake County. Johansen never actually attempted suicide at Lake County. He states, however, that on April 2, 2014, an inmate at Lake County attempted to commit suicide, and on April 18, 2014, another inmate committed suicide.

## III.    **Wexford Medical Services**

Wexford and Lake County entered into a contract, under which Wexford was responsible for prescribing and administering medications to the inmates at Lake County. Wexford was also responsible for the pharmaceutical costs.

In its proposal to obtain the medical provider's contract with Lake County, Wexford stated:

> Wexford Health will continue to ensure a sufficient number of appropriately licensed mental health professionals to provide a full range of evidence-based, culturally sensitive and gender-specific psychiatric services…In the absence of a psychiatrist, the site physician will assume responsibility for the provision of these services (within the scope of his or her practitioner's license). We will also ensure the appropriate referral of offenders for psychiatric evaluation.

Regarding psychotropic medication, the proposal stated:

> Wexford Health is a strong advocate for the prudent use of psychotropic medications in correctional settings. We ensure that psychotropic medications or other forms of pharmacotherapy are prescribed only by a psychiatrist (or psychiatric nurse practitioner, if applicable) and only after the provider has conducted a thorough examination, evaluated the patient…and determined that psychotropic medication is appropriate.

From the beginning of the contract, Wexford had staffing shortages. This lack of staffing impacted the med pass procedure, in that the amount of time needed to complete med pass was increased. There was a backlog of inmates waiting to be seen by medical and mental health professionals. The Lake County Sheriff, Lieutenant Nicholas Kalfas ("Lt. Kalfas"), had concerns about Wexford's deficiencies in the provision of medical care to inmates at Lake County under the contract.

In a letter dated March 5, 2014, the Office of the Lake County Sherriff wrote to the Senior Vice President of Wexford and complained of "serious performance deficiencies on the part of Wexford staff at [Lake County]." In particular, the letter requested immediate action to address, among others: (1) "[t]he lack of qualified nurses to perform physical examinations of inmates;" (2) "[t]he lack of certified medical staff qualified to evaluate inmate intake evaluations;" and (3) "[t]he immediate need to triage medical slips submitted by inmates[.]"

The nurses and social workers had a triage system. Every individual who came to Lake County was first seen by a nurse, then by a social worker. Based on their assessments, the inmates were divided into two categories: (1) psychiatric evaluation

needed, and (2) no psychiatric evaluation needed. With respect to individuals needing psychiatric evaluation, they were further divided into three categories: (1) withdrawal, (2) urgent, and (3) routine.

Dr. Nazimuddhin Mohammed ("Dr. Mohammed") was the only psychiatric health care physician employed by Wexford on site at Lake County from February 2014 to May 2014. During the hiring process, Dr. Mohammed informed Wexford that he had a full-time job during the week and was only available to work at Lake County on Saturdays. Dr. Mohammed was typically at Lake County one day a week for an eight-hour shift.

Wexford had only two licensed social workers working regularly at Lake County, Johnson and Jennifer Bibbiano ("Bibbiano"). They also hired a "PRN" employee to fill in as needed. Bibbiano would prepare a list of inmates for the psychiatrist to see, and prioritized which inmates needed to see him.

Dr. Mohammed saw patients on a priority basis at Lake County. He would see, on average, ten to fifteen patients per day. He was also available by phone if medical staff had any questions about medications or orders. Nurses and social workers sometimes called Dr. Mohammed and requested him to order medications over the phone, which he did. It was the responsibility of the Wexford nurses and social workers to verify prescriptions from an outside source.

Dr. Mohammed was not able to see all the patients on the list during his one day per week at Lake County. Dr. Mohammed was not made aware of inmates that had

been placed on suicide watch. His only concern was the list of inmates that the social workers prepared for him to see. Dr. Mohammed never treated, nor even saw or spoke to, Johansen during the time Johansen was detained at Lake County. He was not directly contacted regarding Johansen's mental health and medication needs.

There was a dichotomy between medical and mental health care at Lake County. Dr. Mizuno, along with nurses, developed and provided medical care. Dr. Mohammed, along with social workers, provided mental health services. Dr. Mizuno did not prescribe, nor was he allowed to prescribe, psychiatric medications at Lake County. In his private practice outside of Lake County, however, Dr. Mizuno prescribed anti-anxiety and antidepressant medications.

Dr. Mizuno attended monthly meetings, during which statistics and "metrics" of the healthcare at Lake County were discussed, including the timeliness of sick calls and issues stemming from a lack of staffing. He testified that it was only possible to see about two percent of the jail population in the two days per week that he was there or in the one day that Dr. Mohammed was present. The triage system helped identify which individuals needed to be seen by a healthcare professional.

Wexford did not provide training to the nursing staff regarding depression, anxiety, or how a patient's mental health affects his or her general health. Social workers, however, received an orientation on behavioral health topics, including warning signs of suicide and general suicide training. Wexford did not provide any training to Dr. Mizuno.

During the time Wexford was the medical services provider at Lake County, there were delays in getting medications verified and approved. Wexford promised to bring in additional resources to correct this deficiency and contracted with outside providers to provide medical care to inmates at Lake County. But the issues remained.

Lake County informed Wexford that continued staffing deficiencies and unaddressed backlogs could result in the loss of the contract. There were no corporate rules or cost-cutting issues impacting whether an inmate would be seen by a psychiatrist.

Tracie Steele ("Steele") was the Health Services Administrator employed at Lake County by Wexford at the beginning of the contract. She did not possess the requisite qualifications under the contract for her position. After a month or two in that position, Steele was removed. Wexford interviewed applicants and asked the Lake County Sheriff's Office to run background checks on candidates in an attempt to fill the vacant Health Services Administrator position. In the meantime, Wexford had regional personnel fill in the Health Services Administrator position on a sporadic basis. The lack of leadership for the Wexford staff impacted inmate health care.

## LEGAL STANDARD

For cross-motions for summary judgment, the Court must "look to the burden of proof that each party would bear on an issue of trial; we then require that party to go beyond the pleadings and affirmatively establish a genuine issue of material fact." *Santanella v. Metro Life Ins. Co.,* 123 F.3d 456, 461 (7th Cir. 1997). Our factual and

inferential construction is unaltered by the procedural nuance of cross-filings, for each party retains their "respective burdens on cross-motions for summary judgment." *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 504 n.4 (7th Cir. 2008). "Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." *Bloodworth v. Vill. of Greendale*, 475 Fed.Appx. 92, 95 (7th Cir. 2012).

## DISCUSSION

Johansen seeks summary judgment against Defendants Townsend, Johnson, and Weatherspoon for inadequate medical care. He also seeks summary judgment on his *Monell* claim against Wexford. Defendants, on the other hand, seek summary judgment in favor of all individual defendants (including Dr. Mizuno and Perez in addition to the above-named defendants), as well as Johansen's *Monell* claim against Wexford. Because many of the arguments from each set of summary judgment briefs overlap, we largely consider both motions at once, focusing on each defendant separately.

## I.  Applicability of the Prison Litigation Reform Act ("PLRA")

Defendants preliminarily argued that Johansen's claims could not survive because he failed to comply with two requirements of the PLRA: (1) the exhaustion of administrative remedies; and (2) the existence of a physical injury. *See* 42 U.S.C. § 1997e(a) and (e). Defendants noted that Johansen (1) filed a single grievance, the

response of which he did not appeal; and (2) alleged no physical injuries. In response, Johansen argued that the PLRA's requirements did not apply to him because he was no longer an inmate when he filed his Complaint. *See Kerr v. Puckett*, 138 F.3d 321, 332–33 (7th Cir 1998) (holding that the PLRA does not apply to prisoner who brought suit after he had been released). The record is silent as to Johansen's release date and therefore unclear as to his status at the time of filing. Ultimately, Defendants conceded that the applicability of the PLRA cannot be resolved at this stage. This issue is thus reserved for further argument at a later stage if necessary.

## II. Inadequate Medical Care

As a pretrial detainee, Johansen's claims arise under the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment's Cruel and Unusual Punishment Clause for convicted prisoners. The Supreme Court has held that the appropriate standard for a pretrial detainee's excessive force claim is "solely an objective one[,]" as opposed to the more demanding standard for a convicted inmate under the Eighth Amendment. *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015). The Seventh Circuit recently extended *Kingsley*'s "objective reasonableness" standard to inadequate medical care claims brought by pretrial detainees. *See Miranda v. County of Lake*, 900 F.3d 335 (7th Cir. 2018).

To prevail on an inadequate medical care claim under *Miranda*, Johansen must prove that (1) the defendants "acted purposefully, knowingly, or perhaps even recklessly," and (2) the defendants' conduct was objectively unreasonable. *See*

*Miranda*, 900 F.3d at 353–54.[2]  Under this standard, a detainee must "provJoe more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* at 353.  *Kingsley* and *Miranda* thus shifted the inquiry from whether the defendant was *subjectively* aware that his or her conduct was unreasonable to whether the defendant's conduct was *objectively* unreasonable.  *Id.* at 351.  "This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *McCann v. Ogle County, Ill.*, 909 F.3d 881, 886 (7th Cir. 2018).

Defendants do not dispute that Johansen's self-reported depression and anxiety are serious medical conditions.[3]  Therefore, the sole issue before the Court with respect to the individual defendants is whether their conduct was objectively unreasonable.

## A. Defendant Weatherspoon

Both parties moved for summary judgment regarding Weatherspoon's treatment of Johansen while at Lake County.  Johansen contends that Weatherspoon had a conversation with Officer Kicklighter, who informed Weatherspoon that Johansen was on suicide watch.  He also claims that he interacted with Weatherspoon during med pass and told her that he needed his medications.  Defendants counter that Weatherspoon's

---

[2] *Miranda* was decided after briefing on the summary judgment motions was completed.  The Court thus analyzes the facts and arguments made in the parties' briefs under the new, appropriate objective standard.

[3] The Court recognizes that Defendants chose not to dispute that Johansen's depression and anxiety qualify as serious conditions solely for the purpose of responding to Plaintiff's summary judgment motion.

interactions with Johansen were limited to cosigning a telephone order from Dr. Mizuno and distributing blood pressure medications to Johansen on three occasions.

Damning to each side's motion for summary judgment is the apparent dispute as to whether a conversation actually occurred between Weatherspoon and Officer Kicklighter. Defendants and Weatherspoon herself outright deny that she had such a conversation, despite Johansen citing to Officer Kicklighter's notes indicating otherwise. That, alone, creates a genuine dispute of material fact that precludes summary judgment. Interestingly, Johansen concedes so in his response to Defendants' motion: "[T]here are disputed questions of fact as to whether [Weatherspoon] was subjectively aware of [Johansen's] serious medical condition, and whether she was deliberately indifferent in her failure to do anything with that knowledge." We agree that disputed questions of fact preclude summary judgment, though we acknowledge that the appropriate standard has changed since Johansen's brief.

As it stands, the record is unclear as to whether Weatherspoon knew about Johansen's psychotropic medication needs and his risk of suicide. Assuming that the conversation occurred, a reasonable jury could find in favor of Johansen. Weatherspoon testified that she never contacted another correctional facility to request medical records and never verified an inmate's medication, which Johansen points to as evidence that she did not appropriately care for him. Defendants' arguments that Weatherspoon stated that she provided reasonable care, that it was not her responsibility

to verify the medications, and that Johansen was consistently being evaluated by others do not, alone, free Weatherspoon of potential liability.

If the conversation never happened, however, the remaining evidence is insufficient to establish liability on Weatherspoon's part. It is not up to the Court to consider the witnesses' credibility and determine whether the conversation did, in fact, occur; such determinations are left for the jury. Absent clarification on this key factor, the Court cannot gauge whether Weatherspoon's actions (or inactions) were objectively unreasonable. Because there are still material facts regarding Weatherspoon's awareness and interactions with Johansen in dispute, the Court denies both parties' motions for summary judgment as to Weatherspoon.

## B. Defendant Townsend

Johansen and Defendants both seek summary judgment regarding Townsend's treatment of Johansen at Lake County. Johansen argues that Townsend was aware of Johansen's mental health needs when she reviewed his intake materials yet took no action to ensure his needs were met. Defendants contend that Townsend never directly interacted with Johansen and had no duty, based on her review of the intake assessment, to act.

The intake assessment that Townsend reviewed indicated that Johansen suffered from depression and anxiety and was taking medically prescribed psychotropic medications. Shortly after her review, Townsend documented a telephone order with Dr. Mizuno. Johansen claims that Townsend was made aware of his mental health

needs, including his previously prescribed psychotropic medications, when she reviewed his intake materials. He adds that Townsend should have contacted the psychiatrist to get Johansen's medications, an action that she failed to take.

Townsend's review of Johansen's intake materials, however, is insufficient to establish liability. Defendants argue, and we agree, that there is no evidence that Townsend was aware that Johansen was not receiving his medications. In fact, Johansen's screening form noted that he received his latest dose of his medications in the morning on the day of his arrival. Johansen claims that Townsend participated in the med pass procedures at Lake County, where Johansen voiced his concerns about not receiving his medications. But Johansen failed to provide any evidence that he interacted with Townsend during med pass, aside from her general participation in the procedure. The fact that Johansen did not raise this claim in his own summary judgment motion but in response to Defendants' motion also bears on its plausibility and strength.

On the record before the Court, even drawing inferences in Johansen's favor, no reasonable juror could find that Townsend's conduct was objectively unreasonable. Johansen failed to demonstrate that Townsend was aware that he was not receiving his medications and thus acted "purposefully, knowingly, or even recklessly." At most, the intake materials informed Townsend that Johansen had not received his medications for a matter of hours or a day, which is not enough to constitute awareness or inadequate medical care. *See Brame v. Dart*, 2011 WL 3704728, at *5 (N.D. Ill. 2011) (finding that a mental health specialist was not aware of plaintiff's mental health issues and

medication needs because "at most, she could have only known that Plaintiff did not receive his medications on that one day"). Townsend's alleged inaction is thus irrelevant, whether or not it was her responsibility to make a records request or, as Defendants suggest, a records request had already been made (which has not been clearly established, either). For this reason, the Court grants summary judgment in favor of Townsend.

### C. Defendant Perez

Defendants seek summary judgment in favor of Perez. Defendants state that Perez's role in Johansen's medical care was limited to performing an intake assessment when Johansen returned to Lake County on April 29, 2014. During the intake, Perez obtained a signed release from Johansen and faxed the release to Walgreen's in order to verify his medications. She recommended a routine mental health referral for Johansen.

Johansen did not counter Defendants' arguments regarding Perez. "Failure to respond to an argument…results in waiver." *Bonte v. U.S. Bank*, 624 F.3d 461, 465 (7th Cir. 2010). In fact, Johansen explicitly conceded that Perez acted in an appropriate manner. In contrasting Perez's actions with Defendant Weatherspoon's, Johansen stated that Perez "at least *attempted* to verify" Johansen's medications but Johansen's release from custody shortly thereafter "obviate[d] the need for any further action on [Perez's] part." The Court therefore grants summary judgment in favor of Perez.

## D. Defendant Dr. Mizuno

Defendants also move for summary judgment in favor of Dr. Mizuno. They argue that Dr. Mizuno's role in Johansen's treatment was limited to reviewing his physical and mental health assessments and prescribing him with blood pressure medications. They contend that there is no reason to believe that Dr. Mizuno was aware that Johansen was not receiving his medications based on his review of Johansen's medical documents. Moreover, they assert that Dr. Mizuno was not responsible for providing mental health treatment at Lake County and was not authorized to prescribe psychotropic medications to inmates.

Johansen attempts to refute Defendants' last point, or at least create a dispute of material fact, by arguing spuriously that Dr. Mizuno *was*, in fact, allowed to prescribe psychotropic medication at Lake County and additionally prescribed such medication in his outside practice. But the evidence does not support Johansen's position. First, he cites to the following testimony by the Lake County Sheriff, Lt. Kalfas:

> Q. If a psychiatrist was unable to see an inmate, was it acceptable for Dr. Mizuno to prescribe medications to that inmate?
>
> **A. Yes.**

This ambiguously posed question does not clearly establish that Dr. Mizuno was allowed to prescribe psychotropic medications. More significantly, however, Johansen's second piece of evidence directly controverts his point. Johansen refers to Wexford's proposal of health care services, which states regarding psychiatric services:

> Wexford Health will continue to ensure a sufficient number of appropriately licensed mental health professionals to provide a full range of evidence-based, culturally sensitive and gender-specific psychiatric services…In the absence of a psychiatrist, the site physician will assume responsibility for the provision of these services (within the scope of his or her practitioner's license).

Reading this provision, alone, may lead one to believe that Dr. Mizuno could prescribe psychotropic medications in the absence of the psychiatrist. But reading one page further shows that this practice is explicitly prohibited:

> We ensure that psychotropic medications or other forms of pharmacotherapy are prescribed only by a psychiatrist (or psychiatric nurse practitioner, if applicable) and only after the provider has conducted a thorough examination, evaluated the patient[,]…and determined that psychotropic medication is appropriate.

Therefore, Johansen's argument that Dr. Mizuno could have and should have prescribed Johansen his psychotropic medications has no merit. It is also irrelevant that Dr. Mizuno prescribed psychotropic medications in his own practice; he is bound to different rules in each setting.

The dichotomy between medical and mental health care at Lake County forecloses any liability on Dr. Mizuno's part for failing to prescribe Johansen his psychotropic medications. Given this background, Dr. Mizuno had no duty whatsoever to care for Johansen's mental health needs. Although he was aware that there was a backlog of inmates waiting to see a psychiatrist, he had no place in providing the mental health care needed in those cases. Moreover, as Defendants argue, it is unclear whether Dr. Mizuno would have known that Johansen was not receiving his psychotropic

medications based on the records alone.  The Court emphasizes that Dr. Mizuno never had direct contact with Johansen.  Instead, Dr. Mizuno reviewed Johansen's medical charts and prescribed him with the appropriate blood pressure medications. Even drawing all reasonable inferences in favor of Johansen, no reasonable jury could find that Dr. Mizuno's conduct was objectively unreasonable.  The Court therefore grants summary judgment in favor of Dr. Mizuno.

### E. Defendant Johnson

Both parties moved for summary judgment regarding Johnson's treatment of Johansen.  Johnson was a social worker who interacted with Johansen multiple times, including while Johansen was on suicide watch.  Johansen argues that Johnson knew that he needed his medications but took no action to verify his medications or ensure that he received them, despite it being her duty to do so.  Defendants, on the other hand, argue that Johnson concluded that Johansen was not in acute distress and referred him to psychiatry and other nursing staff.

Johnsen met with and evaluated Johansen three times.  Each time, Johansen voiced his concern about not receiving his medications.  Johnson had knowledge from Johansen's health care request and grievance that Johansen going off his medications caused suicidal feelings and he was starting to experience those feelings.  When she evaluated Johansen, however, she determined that he was not suicidal at the time and did not seem distressed.  She referred Johansen to psychiatry by checking a box on his mental health evaluation form but never directly contacted a psychiatrist regarding

Johansen's medications. Defendants state that she "created a plan" to follow up with a nurse, which she typically did in these situations, but there is no evidence that she completed this task. Johnson met with Johansen for the third and final time shortly before he was to be transferred to McHenry. He still had not received his medications, but Johnson testified that Johansen was no longer concerned because he would be leaving soon.

Based on the facts before the Court, we find that Johnson's conduct was objectively unreasonable. As a social worker, Johnson had a duty to take care of Johansen's mental health needs, including evaluating his mental state and ensuring that he was receiving his medications. Johnson was aware of Johansen's numerous requests for his medications and the effects of withdrawal from anti-depressants. She furthermore had ample opportunity to verify his medications or at least directly contact nursing staff or the psychiatrist to discuss Johansen's specific needs. She did nothing. One week passed between Johnson's first and last interaction with Johansen, all while Johansen was without his medications.

Given the gravity of Johansen's condition, his voiced concerns about his mental state, and his multiple requests for his medications, Johnson "knew, or should have known, that the condition posed an excessive risk to health or safety" and "failed to act with reasonable care to mitigate the risk." *See Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017) (discussing the *Kingsley* standard); *Stidimire v. Watson*, 2018 WL 4680666, at *4 (S.D. Ill. 2018). Even though Johansen may have appeared "fine" and not

distressed when Johnson evaluated him, his specific need was his anti-depressant medications to ensure that he did not fall into depression or suicidal behavior. There is no excuse for Johnson not to have reasonably acted towards verifying and providing Johansen's medications. Despite her testimony of her typical practice, there is no evidence that she referred Johansen's medication request to the nursing staff. Nor do Johnson's or Dr. Mohammed's testimony that Johansen received appropriate care resolve this issue. The record reflects that, in Johnson's care, Johansen went at least a week without his psychotropic medications, Johnson knowing full well the effects of not taking those medications. Even if Johansen said that he was no longer concerned because he was leaving, a reasonable social worker would have still ensured that Johansen received the medications he needed to keep his depression and suicidal behavior at bay. Johnson's conduct was objectively unreasonable. The Court thus grants summary judgment in favor of Johansen, against Johnson.[4]

## F. Defendant Wexford

Finally, both parties seek summary judgment on the *Monell* claim against Wexford. Under *Monell*, Wexford is subject to liability when an "official policy, widespread custom, or action by an official with policy-making authority" was the "'moving force' behind [a] constitutional injury." *See Monell v. Dept. of Soc. Svcs.*, 436 U.S. 658

---

[4] In his Response to Defendants' motion for summary judgment, Johansen unwisely argues that factual disputes preclude summary judgment in favor of Johnson, given that he, too, moved for summary judgment against Johnson. The disputes highlighted, however, are immaterial to the Court's analysis of whether Johnson's conduct was objectively unreasonable. The inconsistency between one mental health form stating Johansen was "angry and depressed" and Johnson documenting his mood as "ok" does not preclude summary judgment. Based on Johnson's evaluations and actions alone, the Court finds her conduct objectively unreasonable.

(1978); *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (quoting *City of Canton v. Harris*, 489 U.S. 378, 379 (1989)).

Johansen alleges that "there exists a widespread practice at Lake County Jail under which medical personnel, commonly fail or refuse to: (1) properly examine a detainee with a serious medical condition; (2) provide proper medication to a detainee with a serious medical condition; (3) respond to detainees who requested medical attention or medication or asked to see a doctor; or (4) respond to detainees who exhibited obvious signs of a serious medical condition or illness." He contends that the lack of staffing at Wexford and the dichotomy between medical and mental health care created serious deficiencies in Wexford's patient health care.

Defendants raise two arguments. First, they claim that Johansen's *Monell* claim cannot stand because there is no underlying constitutional violation. But, having found at least one defendant liable of inadequate medical care in violation of Johansen's Fourteenth Amendment Due Process rights, the Court disregards this argument. Next, Defendants contend that Johansen failed to present any competent evidence establishing that (1) there was a widespread practice of inadequate medical care; and (2) the staffing shortages at Wexford caused Johansen's injury.

Johansen points to various deficiencies in Wexford's patient care. He notes that Wexford was on notice that staffing shortages at Lake County created "serious deficiencies." The staffing shortages led to backlogs of inmates waiting to see the psychiatrist, Dr. Mohammed. In the end, Johansen was not seen by Dr. Mohammed.

Johansen disparages the dichotomy between general medical and mental health care, arguing that Dr. Mizuno should have been able to prescribe Johansen his medications. He contends, without evidence, that this was a cost-cutting decision on Wexford's part, in which they placed corporate profit above patient health care. Johansen adds that Wexford failed to train its employees regarding depression, anxiety and other mental health effects. He briefly refers to other inmates who have suffered from mental health issues and/or committed suicide in Wexford's care.

While these are certainly causes for concern regarding Wexford's performance, Johansen fails to establish liability against the corporation for two reasons. First, the little evidence set forth with loads of speculation does not demonstrate a widespread practice of inadequate medical care. Despite the staffing shortages, Johansen was seen at least five times within a twenty-day stint at Lake County. During that time, he was placed on suicide watch as a result of his grievance, and he met with social worker Johnson at least three times. These facts controvert Johansen's position that a widespread practice of inadequate medical care existed at Wexford. He can only point to one instance of inadequate care thus far, when Johnson failed to provide him with his medications. This is insufficient to prove a widespread practice.

Secondly, Johansen has failed to satisfy the causation element. Wexford's written and actual practice, though riddled with deficiencies, still resulted in Johansen being seen multiple times with respect to his mental health. Although Johansen never ultimately saw Dr. Mohammed, he has not demonstrated that this was a result of

Wexford's practice. Even more significantly, Johansen could have and should have received his medications even without seeing Dr. Mohammed. That other staff failed to act reasonably does not shift blame on Wexford as a whole. The little evidence Johansen has put forth is simply not enough.

Moreover, the cases Johansen relies on are distinguishable. In *Woodward v. Correctional Medical Services of Illinois, Inc.*, the court found *Monell* liability when a pretrial detainee killed himself because, despite awareness of his suicidal tendencies, he was never placed on suicide watch and never referred for mental health treatment. 368 F.3d 917, 928 (7th Cir. 2004). In *Watkins v. Ghosh*, there was evidence that the plaintiff did not receive medical care of any kind for as long as one year because Wexford staff ignored complaints, letters, and grievances. 2014 WL 840949, at *6 (N.D. Ill. 2014). Johansen has not provided such evidence in this case. Although he highlighted issues with Wexford's health care, he did not provide sufficient information to support a finding that Wexford had a widespread practice of inadequate medical care that caused his injuries. For the reasons discussed above, the Court grants summary judgment in favor of Wexford.

## CONCLUSION

For the aforementioned reasons, the Court grants summary judgment in favor of Defendants with respect to Townsend, Perez, Dr. Mizuno, and Wexford. The Court grants summary judgment in favor of Johansen as against Johnson. The Court denies both motions for summary judgment with respect to Weatherspoon. All other

defendants are dismissed with prejudice.  It is so ordered.

Dated: 2/22/2019

_____
Charles P. Kocoras
United States District Judge